IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | No. 2:01-cr-0136 |
| ) | No. 2:05-cv-0057 |
| ) | |
| LESTER JONES ) | Judge Thomas M. Hardiman |
| ) | |
| Defendant. ) | |

**OPINION**

Presently before the Court is Defendant Lester Jones' Motion to Vacate Sentence pursuant to 28 U.S.C. §2255. Defendant has asserted that his sentence should be vacated because his counsel was ineffective in connection with his sentencing proceeding. For the reasons that follow, Defendant's Motion shall be granted.

**I.    PROCEDURAL HISTORY**

On December 7, 2001, Lester Jones (Jones) pleaded guilty to violating 18 U.S.C. §922(g)(1), possession of a firearm by a convicted felon. Although that offense carries a statutory maximum of ten years imprisonment, Jones was subject to an enhanced penalty under the Armed Career Criminal Act, 18 U.S.C. §924(e) (ACCA), because it was determined that he had three previous felony convictions either for a violent crime or a serious drug trafficking offense. One of Jones' prior convictions used to trigger the application of the ACCA was a 1993 juvenile adjudication (Juvenile Adjudication) for aggravated assault docketed at 1869-90 in the Court of Common Pleas of Allegheny County, Pennsylvania. In his 1993 juvenile case, Jones was adjudged delinquent and sentenced to confinement by Joseph Jaffe, who at the time served

as a Judge of the Court of Common Pleas of Allegheny County, Juvenile Court Division.[1]

At sentencing before this Court on May 7, 2002, Jones argued that the Juvenile Adjudication was constitutionally infirm because the record thereof was silent as to whether he was represented by counsel. Jones argued that this infirmity should have precluded the Juvenile Adjudication from counting as a qualifying prior conviction under the ACCA. After hearing argument, the Honorable Donald E. Ziegler rejected Defendant's contentions that a silent record was sufficient for him to collaterally attack the Juvenile Adjudication. Consequently, the Court included that conviction as a qualifying prior offense and imposed a fifteen year sentence as required by the ACCA. Jones appealed his sentence to the Court of Appeals for the Third Circuit, which affirmed, and the United States Supreme Court denied Jones' petition for writ of certiorari.

Although Jones was unsuccessful in his direct appeal, *United States v. Jones*, 332 F.3d 688, 697-98 (3d Cir. 2003), that decision does not foreclose the collateral attack he now raises. Although the certified record of the Juvenile Adjudication was silent regarding whether Jones was represented by counsel, the Court of Appeals affirmed his sentence, holding that a presumption of regularity attaches to convictions even where the certified record is silent on the issue of whether a defendant was represented by counsel. *Id.* at 698. The Court of Appeals noted that Jones *had not alleged* that he *actually* was not represented by counsel at the hearing on the Juvenile Adjudication, only that the record was silent regarding this issue. *Id.* at 697 (emphasis added).

---

[1] At the time of his testimony in the instant case, Jaffe was no longer a judge in part because he entered a guilty plea in this Court on February 10, 2003 to charges that he violated the Hobbs Act, 18 U.S.C. §1951(b)(2).

On January 18, 2005, Jones, acting *pro se*,[2] filed the instant motion to vacate sentence pursuant to 28 U.S.C. §2255, arguing that he received ineffective assistance of counsel at sentencing because his attorneys failed to argue or present evidence that he actually was not represented by counsel at the Juvenile Adjudication.

## II. FINDINGS OF FACT

The Court conducted evidentiary hearings regarding the instant motion on August 25, 2005, June 13, 2006, and June 20, 2006. Based upon the testimony offered, as well as the Court's determinations as to the credibility of the witnesses and all other evidence presented, the Court finds the facts of record to be as follows:

### A. *The Juvenile Adjudication*

At the evidentiary hearing in this Court, Jones testified that he was in the holding area at the juvenile court facility for two hours on the day of the Juvenile Adjudication, yet he was never approached by a public defender. He further testified that the hearing started around 12:00 or 1:00 p.m. Jones testified that a co-defendant, who was represented by counsel, was present at the hearing as well. Jones recalled that his mother and grandmother also were present.

Jones testified that he was not represented by counsel, and that Judge Jaffe did not ask him if he wanted counsel, but merely inquired whether he admitted or denied the petition against him. Jones conceded that he did not request Judge Jaffe to appoint counsel for him. He indicated that two witnesses were called: the arresting officer and the victim. Jones testified that

---

[2] After filing his *pro se* petition, the Court appointed counsel for Jones on April 20, 2005. Jones subsequently retained private counsel on May 1, 2006.

3

he wanted to cross-examine the witnesses, but he was not permitted to do so. He also indicated that he wanted to testify but did not do so. Jones admitted that he did not ask Judge Jaffe for permission to ask questions of the witnesses or to testify because he was intimidated. Jones also testified that counsel who represented his co-defendant did not participate in the case, and that when he asked his co-defendant's counsel to ask questions on his behalf, he was told that counsel could not do so. According to Jones, the hearing lasted only ten minutes. Jones testified that he did not appeal the Juvenile Adjudication because he lacked the resources or knowledge to do so.

The United States called Joseph Jaffe to testify at the August 26, 2005 hearing in this matter. Jaffe testified that he had no independent recollection of Jones' 1993 hearing, as it was one of thousands of juvenile cases over which he presided while serving as a Juvenile Court Judge. Nevertheless, Jaffe acknowledged that it would have been unlawful for him to deny an unrepresented juvenile the right to question witnesses or to testify. Jaffe also stated that during his tenure as a Juvenile Court Judge, he never knowingly denied an accused juvenile wishing to ask questions or testify the opportunity to do so if the juvenile indicated an intention to do so. Jaffe further testified that if Jones did appear without a lawyer, it would have been his responsibility to decide whether Jones validly waived his right to counsel.

Significantly for this case, Jaffe acknowledged that there "certainly were cases where the public defender's office was representing more than one defendant or representing co-defendants in a particular case," and recalled that, occasionally, one attorney appeared to represent two defendants. In such cases, Jaffe would appoint a private attorney to represent one of the two defendants only if he was made aware of a possible conflict of interest.

Furthermore, Jaffe indicated that it was not unusual for there to be one private lawyer representing two defendants in a case. Jaffe also testified that it was possible, given the configuration of his courtroom, that he would neither have heard nor been made aware of a conversation, such as the one alleged by Jones, whereby one lawyer who had appeared to represent one co-defendant would indicate to an unrepresented co-defendant that he could not assist in his defense. Jaffe conceded that he may not have asked the parent of an unrepresented co-defendant whether that defendant waived his right to counsel if Jaffe mistakenly thought that the attorney present at the hearing was representing both co-defendants.

Alma Jones, the Defendant's mother, also testified at the August 26, 2005 evidentiary hearing. Ms. Jones stated that she was present with her son at prior juvenile proceedings and was aware of how the system functioned. She testified that her son did not have counsel at the hearing before Judge Jaffe and that Jaffe did not ask her if she, as guardian to her minor son, was willing to waive counsel. Regarding the proceeding itself, Ms. Jones recalled that the arresting officer was called to testify and that the hearing was short. Ms. Jones also recalled that she was given an opportunity to speak on her son's behalf, and that she did not make any recommendations. Ms. Jones did not attempt to perfect an appeal on her son's behalf because she did not know how to do so, and stated that she wanted him to have a cooling off period.[3]

---

[3] The Court finds Mr. Jaffe and Ms. Alma Jones to be fully credible witnesses. However, the Court views Mr. Lester Jones' testimony, while undisputed, to be of more dubious reliability, primarily because Mr. Jones' recollection of the specific events occurring in 1993 were more developed in 2005 and 2006 than they were at the time of his sentencing in 2002. The Court considers it unlikely that Mr. Jones' memory of these events has improved as the amount of time separating him from those events has increased. Nevertheless, Jones' testimony is corroborated by his mother's fully credible testimony on the key issue implicated by the instant motion -- that Mr. Jones did not have counsel in connection with the Juvenile Adjudication.

### B. *Jones' 2002 Sentencing*

On July 18, 2001, Jones was charged in this Court with being a felon in possession of a firearm, in violation of 18 U.S.C. §922(g)(1). Eight days later, on July 26, 2001, Assistant Federal Public Defender Marketa Sims was appointed to represent Jones, who eventually pleaded guilty on December 7, 2001.

In preparation for Jones' sentencing hearing, on January 22, 2002, attorney Sims instructed Nick Bertino, an investigator then employed by the Federal Public Defender's Office, to contact the Defendant's mother and obtain letters of recommendation. Although Bertino has no recollection of having followed up on that instruction, letters of recommendation were filed on behalf of the Defendant, including one from his mother, Alma Jones. On or about January 23, 2002, the Court and counsel received Jones' pre-sentence report, in which the probation officer found that Jones qualified as an armed career criminal. In so finding, the probation officer relied on the Juvenile Adjudication.

On February 7, 2002, attorney Sims filed the Defendant's statement with respect to sentencing factors in which Jones objected to the use of the Juvenile Adjudication as a basis for classifying him as an armed career criminal on two grounds. As the first ground for objection, Sims argued that – based on the Supreme Court's ruling in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and the Ninth Circuit's ruling in *United States v. Tighe*, 266 F.3d 1187 (9th Cir. 2001) – the Juvenile Adjudication could not be used as qualifying offense for purposes of the ACCA because it was not charged in the indictment and proven to a jury beyond a reasonable doubt.

Sims also objected to the use of the Juvenile Adjudication for purposes of applying the ACCA to Jones "because the certified court records of that adjudication do not reflect that he was

represented by counsel and he was incarcerated as a result of the adjudication." In making this argument, Sims relied on *Burgett v. State of Texas*, 389 U.S. 109 (1967), contending that it stood for the proposition that "when certified records of a . . . conviction [do] not show that the defendant was represented by counsel or that he waived counsel, the records raised a presumption that the defendant was denied counsel" and that "the records could not be used to enhance the defendant's sentence in a subsequent prosecution." Additionally, Sims contended that *Burgett*, "expressly held that 'presuming waiver of counsel from a silent record is impermissible.'" In summary, Sims argued that "because the certified court records do not reflect that Mr. Jones was represented by counsel in connection with the juvenile adjudication and he was imprisoned as a result of that adjudication, that adjudication cannot be used to enhance his sentence and the ACCA does not apply."

In response to the Defendant's position statement with respect to sentencing factors, Government counsel specifically pointed out that Jones had not affirmatively alleged that he did not have counsel with respect to the Juvenile Adjudication, but merely alleged that the records of that adjudication did not reflect the presence of counsel. Sims did not refute the Government's allegation as to the lack of any evidence by Jones as to whether he was actually represented by counsel at the Juvenile Adjudication.

Prior to the sentencing hearing, Sims questioned Jones regarding whether he was represented by counsel at the Juvenile Adjudication. Jones made statements to Sims which led her to believe that he could not recall whether he was represented by counsel at that hearing. Specifically, Jones informed Sims that the hearing was over in five minutes, he was only fifteen years old, and all that he could remember was his mother told him to sit down and shut up.

Although Jones did not advise Sims that he had a present recollection that he was not represented by counsel, he did inform Sims that his mother was present at the hearing. Nevertheless, Sims neither contacted Jones' mother to ascertain whether she recalled whether her son was represented by counsel at the hearing nor instructed investigator Nick Bertino to do so.

On May 1, 2002, one week prior to Jones' sentencing, attorney Sims unexpectedly was forced to take leave from the Federal Public Defender's Office because of the premature birth of her son. Sims testified that as of May 1, 2002, when the Jones file was transferred to Assistant Federal Public Defender W. Penn Hackney, there still was work to be done on the case prior to Jones' sentencing. When Sims left the office, the Jones file contained an outline of the arguments she intended to make with respect to sentencing, as well as all the documents which were filed as of record, including the parties' positions with respect to sentencing. Sims did not specifically advise Hackney to contact Alma Jones with respect to the issue of counsel, although Hackney reviewed the file prior to Jones' sentencing hearing. Nevertheless, there was nothing in the file that caused Hackney to believe that there was anything left to be done in preparation for Jones' sentencing hearing.

On May 6, 2002, one day prior to the hearing, Hackney spoke with Sims about Jones' sentencing. At that time, Hackney reviewed with Sims the fact that Sims had intended to argue that, based on *Burgett*, the Government had the burden of proving that the Defendant had counsel. Hackney does not recall Sims advising him that there was anything further to be done with respect to Jones' sentencing. Based on the file, it was clear to Hackney that Sims intended

to attack the Juvenile Adjudication based on *Apprendi* and *Burgett*.[4]

At Jones' sentencing hearing, Hackney contested the validity of the Juvenile Adjudication pursuant to the *Burgett* and *Apprendi* arguments outlined by Sims and contained in the file. By Hackney's admission, he put no independent thought into this case. He did not interview anyone or conduct any investigation of any sort during the days leading up to Jones' sentencing. Hackney met once with Jones immediately prior to sentencing, but he neither asked Jones if he recalled whether he had counsel during the Juvenile Adjudication nor interviewed Alma Jones. This Court rejected the Defendant's arguments and sentenced Jones as an armed career criminal to fifteen years imprisonment.

### C. Jones' Appeal Of His 2002 Sentence

Jones appealed his sentence and challenged the use of the Juvenile Adjudication as grounds for enhancing his sentence under the ACCA. His direct appeal was premised on the same two arguments presented by Hackney at the time of sentencing.

On May 28, 2002, Jones wrote a letter to his appellate counsel, Assistant Federal Public Defender Karen Sirianni Gerlach. At that time, Jones advised attorney Gerlach that he believed that trial counsel, specifically attorney Hackney, had been ineffective in representing him at sentencing. Jones believed counsel was ineffective because he was under the impression that the Government had to include the Juvenile Adjudication in the indictment to use it as a qualifying

---

[4] It should also be noted that none of the existing juvenile court records reflect whether Jones was represented by counsel at the Juvenile Adjudication. The court reporter notes no longer exist, as they were destroyed after seven years. Accordingly, those notes would not have existed at the time of the sentencing hearing on May 7, 2002. Although then-Judge Jaffe maintained bench notes, they were never retained.

offense under the ACCA, which it had not. Jones also complained that he was led to believe that the Government had the burden of proof with respect to establishing that he had been represented by counsel with respect to the Juvenile Adjudication, which it did not. In the letter, Jones also indicated that attorney Sims had told him that they would be successful in challenging the Juvenile Adjudication and they were not.

Jones did not advise Gerlach in the May 28, 2002 letter that he had ever told Sims or Hackney that he recalled not being represented by counsel at the Juvenile Adjudication. In a subsequent letter, however, Jones told Gerlach that since he did not have an attorney present at the Juvenile Adjudication, he was made the scapegoat. Gerlach further testified that Jones repeatedly told her that he had not been represented by counsel at the Juvenile Adjudication.

In preparing for appellate argument on the issue of whether Jones was represented by counsel, Gerlach asked Sims and Hackney what Jones had said at the time of sentencing with respect to whether he had counsel at the Juvenile Adjudication. At that time, Sims told Gerlach that Jones had indicated that he could not recall whether he had counsel, which was why Hackney did not offer evidence to that effect. Sims relayed to Gerlach that Jones merely told her that the hearing took five minutes and his mother told him to sit down and shut up, so counsel had to rely firmly on *Burgett* and make the Government prove that the Juvenile Adjudication was valid. On June 19, 2003, the Court of Appeals for the Third Circuit upheld Jones' sentence, rejecting his arguments that the District Court erred in considering his Juvenile Adjudication a qualifying ACCA offense. *See United States v. Jones*, 322 F.3d 688 (3d Cir. 2003).

On May 7, 2004, Jones wrote a letter to Sims, asking her to provide him with an affidavit indicating that he told her at the time of sentencing that both he and his mother could testify positively that he was not represented by counsel at the time of sentencing.[5] Sims testified at the *habeas* hearing that, prior to sentencing, Jones did not in fact advise her that he or his mother had a present recollection that he was not represented by counsel at the time of the Juvenile Adjudication.

III.   **LEGAL STANDARD**[6]

When bringing a Sixth Amendment claim alleging ineffective assistance of counsel, the defendant has the burden of establishing that his counsel were ineffective. *See Whitney v. Horn*, 280 F.3d 240, 258 (3d Cir. 2002). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that [it] cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

The Court of Appeals for the Third Circuit has adopted a two-part standard that a defendant must satisfy to establish that counsel was ineffective:

---

[5]   Jones has not offered either a reply to his letter of May 7, 2004, or an affidavit of Sims into the record.

[6]   Jones may not now collaterally attack his Juvenile Adjudication on Sixth Amendment grounds, nor can he re-assert his *Apprendi* argument. With respect to those issues, this Court is bound by the Court of Appeals for the Third Circuit's decision in *United States v. Jones*, 332 F.3d 688 (3d Cir. 2003). Therefore, the Court will consider only the issue of whether Jones' sentencing counsel was ineffective in their representation of him at his sentencing hearing in 2002.

      (1)    that the defendant's attorney's performance was deficient, i.e., unreasonable under prevailing professional standards; and,

      (2)    that the defendant was prejudiced by the attorney's performance.

*United States v. Booth*, 432 F.3d 542, 546 (3d Cir. 2005) (citing *Strickland*, 466 U.S. at 687, 694).

## IV.   ANALYSIS

### *A.   Deficient Performance*

In applying the first prong of the *Strickland* inquiry regarding whether counsel's performance was deficient, the Supreme Court has cautioned that "judicial scrutiny . . . is highly deferential," and that courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688-89. In fact, where an attorney's actions are the result of "strategic choices made after thorough investigation of the law and facts relevant to plausible options," the Supreme Court has held that the presumption of reasonableness is essentially irrebuttable. *Strickland* 466 U.S. at 690; *see also Marshall v. Cathel*, 428 F.3d 452, 462-63 (3d Cir. 2005) (citing *Strickland* for same).

Where, as here, the *Strickland* inquiry turns on counsel's alleged failure to investigate, the reasonableness of counsel's investigation will place her decision somewhere along a continuum between a "strategic choice" and a blind guess. At one end of the continuum is the strategic choice made after a complete investigation. Strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable." *See Strickland*, 466 U.S. at 690. At the other end of the continuum is the blind guess. "Because counsel can hardly be said

to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made," *see United States v. Gray,* 878 F.2d 702, 711 (3d Cir. 1989), a completely uninformed decision is not entitled to deference under *Strickland. See Holland v. Horn,* 150 F. Supp.2d 706, 748 n.37 (E.D. Pa. 2001) (willful blindness not valid basis for attorney's tactical decision). The broad middle range of the continuum includes the incomplete investigation. As to this middle ground, the Supreme Court has stated that strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690-91.

Although various considerations can place a purported strategic decision closer to one end of the continuum or the other, the facts of the case at hand make one consideration particularly important. Specifically, the objective reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. *Strickland,* 466 U.S. at 695-96. Such is the case because "counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." *Id.* at 696.

At the time of his sentencing in 2002, Jones communicated two critical facts to attorney Sims regarding the Juvenile Adjudication. First, Jones told Sims that he could recall only that the hearing took five minutes, and his mother told him just to sit down and shut up. Second, Jones told Sims that his mother was present at the Juvenile Adjudication. Because Jones did not state that he had a present recollection of not being represented in that hearing, Sims decided to

13

argue that, as a matter of law, the silence of Jones' 1993 juvenile records regarding whether he had counsel *ipso facto* prevented the Juvenile Adjudication from being used as an ACCA qualifying offense. This strategy was adopted by Hackney without any further investigation when the Jones file was transferred to him at the proverbial eleventh hour. As such, Hackney did not present any evidence that Jones *actually* was not represented by counsel at the sentencing proceeding.

The Government has argued that Sims' (and later Hackney's) decision to challenge the validity of the Juvenile Adjudication pursuant to *Burgett* and *Apprendi* was a strategic decision that is entitled to a strong presumption of reasonableness under *Strickland* and its progeny. There is merit in the Government's argument as far as it goes. In light of the state of the law at the relevant time, it was a reasonable strategic decision for Sims and Hackney to pursue legal arguments under *Burgett* and *Apprendi*. This sheds no light, however, on the question whether it was a reasonable strategic decision for Jones' counsel not to investigate the critical question whether he in fact was represented by counsel at the hearing. Under the facts of this case, the Court concludes that counsel's decision not to investigate was unreasonable under *Strickland*.

In reaching this conclusion, the Court is guided by *Rolan v. Vaughn*, 445 F.3d 671 (3d Cir. 2006). In *Rolan*, a petitioner who was convicted of first-degree murder in Pennsylvania state court challenged his conviction on the basis of ineffective assistance of counsel. There, Rolan had provided to his attorney the names of two potential witnesses whom he thought could testify that his actions were taken in self-defense. But Rolan's lawyer never contacted them and did not argue self-defense at trial. *Id.* at 674-76. Although the Third Circuit noted that "the decision to forgo a self-defense claim is of the type that may be entitled to a presumption of validity," it

found that no such presumption could apply to the decision of counsel in that case. *Id.* at 682. The Court of Appeals found that failing to investigate the two potential witnesses identified by Rolan before making this strategic decision meant that the "decision not to present the defense cannot be accord[ed] the normal deference [given] to strategic choices because it was uninformed." *Id.* Consequently, the Court of Appeals found that the performance of Rolan's counsel was objectively unreasonable for purposes of the *Strickland* inquiry.

The instant case presents facts analogous to those that the Court of Appeals found problematic in *Rolan*. While true that the defendant in *Rolan* specifically requested that his attorney contact the two purported witnesses – whereas here, Jones did not specifically request that counsel contact his mother – the Court finds that the information conveyed by Jones was sufficient to inform counsel of a need to conduct further investigation. Specifically, Jones made attorney Sims aware that there was a question as to whether he was represented by counsel at the Juvenile Adjudication, and Sims knew that the answer to that question was central to Jones' sentencing because the Juvenile Adjudication was a qualifying offense for purposes of the ACCA. Sims also knew from Jones that his mother was a potential witness on that subject because Jones had informed Sims that his mother was present at the 1993 proceeding. Despite having this information, Sims formulated a legal defense for Jones without investigating this critical factual issue. At the time Sims was hospitalized because of the premature birth of her son, she had not yet completed her preparation for Jones' sentencing hearing. Thus, it is unclear whether Sims would have interviewed Alma Jones regarding whether her son was represented by counsel at the Juvenile Adjudication. Whether Sims intended to call Alma Jones or not, the result is the same under *Rolan*. If Sims had intended to call Alma Jones, the subsequent failure

of replacement counsel to do so would be patently unreasonable. Likewise, if Sims already had decided to forego calling Alma Jones because she had made a strategic decision to argue *Apprendi* and *Burgett,* her own decision would have been uninformed and therefore unreasonable.

In sum, the Court finds that the uninformed decision by Jones' counsel not to present factual evidence attempting to establish that Jones *actually* was unrepresented by counsel is not entitled to a presumption of reasonableness. Had Alma Jones been interviewed by attorneys Sims or Hackney, she would have told them that her son was not represented by counsel at the Juvenile Adjudication. Armed with this knowledge, Hackney certainly would have called Alma Jones to testify at the sentencing hearing. As such, this Court finds that the representation provided by Jones' counsel falls below the objective standard of reasonableness required by *Strickland.*[7]

### B. Prejudice

The prejudice component of an ineffective assistance claim requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Defendant "need not show that counsel's deficient performance 'more likely than not altered the outcome in the case' - rather, he must show only 'a probability sufficient to undermine confidence in the outcome.'"

---

[7] The Court's finding that Jones' counsel was deficient under *Strickland* in this case should not be misconstrued as a general indictment of the quality of the representation provided by attorneys Sims and Hackney, both of whom are talented and dedicated public servants who regularly provide excellent counsel to their clients. In light of the Court's experiences with attorneys Sims and Hackney, it appears that the unfortunate confluence of Sims' medical emergency and Hackney's eleventh-hour appearance contributed to the problem here.

16

*Jacobs*, 395 F.3d at 105 (citing *Strickland*, 466 U.S. at 693-94). "This standard is not a stringent one." *Id.* (internal quotations omitted); *see also Thomas*, 428 F.3d at 502 (citing *Jacobs* and *Strickland* for same). However, this showing "may not be based on mere speculation," but rather "it must be made based on the potential witness's testimony to the habeas court." *Rolan*, 445 F.3d at 682 (citations omitted).

Here, the question of whether Jones suffered prejudice as a result of his counsel's failure to investigate his mother's recollection of the Juvenile Adjudication is not a close one. Ms. Jones offered competent and credible testimony before this Court that Jones did not have counsel at the Juvenile Adjudication, and that she as guardian never was asked to waive counsel for her son, who was a minor at the time. In light of the fact that the Government admittedly had no evidence to establish that Jones actually was represented by counsel at the 1993 proceeding, this evidence would have stood uncontradicted at Jones' 2002 sentencing proceeding – just as it did at the hearing on his pending motion. That being so, the Court finds that counsel's failure to obtain and present this evidence is sufficient to "undermine confidence in the outcome" of Jones' 2002 sentencing proceeding. As such, Jones has established prejudice sufficient to satisfy the second prong of the *Strickland* inquiry. *See Strickland*, 466 U.S. at 693-94.

## V.  CONCLUSION

For the foregoing reasons, the Court finds that Lester Jones was denied effective assistance of counsel at his 2002 sentencing proceeding in this Court, in violation of his Sixth Amendment right to counsel. As such, the Court shall vacate the May 7, 2002 sentence and re-sentence Defendant Lester Jones.

An appropriate Order follows.

BY THE COURT:

Dated: October 12, 2006

*Thos M. Hardiman*
Thomas M. Hardiman
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:01-cr-0136 |
| | ) | No. 2:05-cv-0057 |
| | ) | |
| LESTER JONES | ) | Judge Thomas M. Hardiman |
| | ) | |
| Defendant. | ) | |

### ORDER

AND NOW, this 12th day of October, 2006, upon consideration of Defendant, Lester Jones' Motion To Vacate Sentence (Doc. No. 49), it is hereby

ORDERED, that said Motion is GRANTED and a new sentencing hearing is scheduled for Friday, December 8, 2006 at 10:00 a.m.

BY THE COURT:

*/s/ Thos M. Hardiman*

Thomas M. Hardiman
United States District Judge